**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **SARA LONG,** ) | Case No.  1:05cv902 |
| ) | |
| **Plaintiff,** ) | |
| ) | **Judge Dan Aaron Polster** |
| vs. ) | |
| ) | |
| **CITY OF LORAIN, OHIO,** *et al.*, ) | **MEMORANDUM OF OPINION** |
| ) | **AND ORDER** |
| **Defendants.** ) | |

Before the Court is the Motion for Summary Judgment filed by Defendant City of Lorain (***Doc. #73***).  For the reasons stated below, Defendant's motion is **DENIED**.

**I.**[1]

Plaintiff met Defendant Jesus Sanchez, a Lorain Police officer, during a bingo game in late 2000.  *Deposition of Sarah Long* (hereinafter "*Long Dep.*"), *Vol. I*, at 48-49.  Soon after, in early 2001, Sanchez began pulling Plaintiff over with his police cruiser, even though Plaintiff repeatedly asked him to stop.  *Id*. at 55-56.  Sanchez eventually initiated inappropriate sexual contact with Plaintiff on three different occasions.  *Id*. at 84.  The first instance occurred when Plaintiff asked for a police escort to retrieve mail from her ex-husband's house.  *Id*.

---

[1] As required in ruling on a motion for summary judgment, the facts stated in this section are undisputed or viewed in the light most favorable to the nonmoving party.

Sanchez was dispatched to escort Plaintiff in his police cruiser. *Id.* at 85. While taking Plaintiff back home after she retrieved her mail, Sanchez pulled his police cruiser over, exited the car, headed toward the back door where Plaintiff was sitting, leaned through an open back window and grabbed Plaintiff by her shirt collar and kissed her on the mouth against her will. *Id*. at 85-87.

The second incident occurred when Sanchez came over to Plaintiff's house, unannounced, while Plaintiff was pregnant. After Plaintiff opened her door, Sanchez pushed his way into her home. *Id.* at 95-97. Despite Plaintiff's protests that she did not want Sanchez in her house, Sanchez grabbed her by the wrists, put her wrists above her head, kicked her legs apart, forcibly kissed her on the mouth, rubbed his hands down her stomach toward her vagina and stated "[s]o, we're having a baby." *Id.* at 96-98. Plaintiff's three children and a friend's child were in the house during this entire incident. *Id*.

The third instance occurred when Sanchez pulled Plaintiff over while she was driving in her car with her kids and a friend. *Id.* at 106, 109. Once Plaintiff realized that it was Sanchez who had pulled her over, she exited her car and proceeded toward Sanchez's police cruiser after Sanchez motioned for her to come to his car. *Id*. at 106-07. Plaintiff approached the driver's side of Sanchez's car where Sanchez was seated. *Id*. at 108-09. After Sanchez told her "[y]ou can't go until you come here," Plaintiff leaned toward the window at which point Sanchez kissed her on the mouth. *Id*. at 109.

Plaintiff filed a complaint against Sanchez with the Lorain Police Department on September 4, 2002. *Deposition of Celestino Rivera* (hereinafter "*Rivera Dep.*"), *Vol. III*, Ex. 31. A pre-disciplinary hearing was held on November 20, 2002, where the hearing officer, Captain

-2-

Robert Davey, found Sanchez "guilty of all charges." *Id*. On November 24, 2002, Lorain Chief of Police Celestino Rivera concurred with the decision and, pursuant to Davey's recommendation, issued an official letter of reprimand to Sanchez. *Id*. The letter of reprimand prohibited Sanchez from having any contact with Plaintiff or her family and warned Sanchez to "devote [his] full attention to police duties when ... working," to detain citizens only when he has "a reasonable suspicion to stop or probable cause to arrest," and to refrain from initiating "any police action against an individual with whom you have a personal relationship or conflict ..." *Id*.

Out of these incidents arose the instant lawsuit, originally filed in the Lorain County Court of Common Pleas on March 21, 2005, and removed to this Court on April 6, 2005. *Doc. #1*. Following three amendments, Plaintiff's complaint contains eight causes of action, five against Sanchez and three against the City of Lorain. The claims against the City of Lorain include: (1) a state law claim for negligence, recklessness, or willful and wanton misconduct in failing to properly supervise Sanchez; (2) a federal civil rights claim for violating the fourteenth amendment; and (3) a federal civil rights claim pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978), for a municipal policy or custom causing injury. *Doc. #22*.

On September 11, 2006, litigation of this case was suspended[2] pending the conclusion of a criminal investigation of Sanchez. *Doc. #51*. On March 1, 2007, a criminal indictment was filed against Sanchez in the Lorain County Court of Common Pleas for two counts of menacing by stalking. *Ohio v. Sanchez*, Case No. 07cr072917, Lorain County Court of

---

[2]The case had also been previously stayed because Sanchez was on military duty. *See Doc. #40*.

Common Pleas. The Court received notice of this indictment on March 16, 2007, after which litigation of this case resumed. *Doc. #52*.

After a bench trial, on December 3, 2008, the Lorain County Court of Common Pleas found Sanchez guilty of one count of the 4th degree felony of menacing by stalking but found Sanchez not guilty on the other menacing by stalking count. *Ohio v. Sanchez*, Case No. 07cr072917, Lorain County Court of Common Pleas. On May 29, 2009, following extensive discovery, including the deposition of Sanchez, Defendant City of Lorain ("Defendant" or "the City") filed the instant motion for summary judgment. *Doc. #73*. The Court granted Plaintiff three extensions before her opposition to the motion for summary judgment was filed on August 19, 2009.[3] *Doc. #101*.[4] After an extension was granted, Defendant filed its reply brief *(Doc. #97)* and a motion to exclude the affidavit of Dennis Davis (*Doc. #98*).

Plaintiff filed an opposition to the motion to exclude the affidavit of Dennis Davis on October 9, 2009. *Doc. #102*. That same day, the Court held a teleconference, during which it denied Defendant's motion to exclude the affidavit of Sergeant Dennis Davis, but allowed Defendant until November 9, 2009, to depose Davis and both parties until November 23, 2009, to file supplements to their summary judgment briefing following Davis' deposition. On November 22, 2009, Plaintiff moved for an extension until December 15, 2009 for the supplemental briefing, on the grounds that Plaintiff was allegedly not permitted re-direct examination of Davis during his deposition. *Doc. #106*. Following a teleconference with the parties on November 24, 2009, the Court ordered that Davis' deposition be completed by

---

[3]One of the extensions was a one-day extension due to trouble in filing the opposition brief.

[4]The original version, *Doc. #80*, was amended upon leave of the Court to correct citation errors.

December 4, 2009, and that supplemental briefs be filed no later than December 15, 2009.  The parties simultaneously filed supplemental briefs on December 15, 2009.  *Docs. #109, 111*.  Thus, all briefing has been completed and Defendant's motion for summary judgment is ripe for adjudication.

**II.**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  All facts and inferences drawn therefrom must be viewed in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997).  If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[A] municipality cannot be held liable under §1983 on a *respondeat superior* theory."  *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978).  Rather, a municipality will be liable under §1983 only if any injury occurs pursuant to a municipal custom or policy.  *Id.* at 694.  This requires Plaintiff to "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of execution of that policy."  *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987).  A plaintiff may establish municipal liability by showing a policy of inadequate training and supervision, including a

-5-

policy of tolerating federal rights violations [that] is unwritten but nevertheless entrenched." *Moldowan v. City of Warren*, 578 F.3d 351, 393 (6th Cir. 2009). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir. 2006).

## III.

As an initial matter, the City argues that the state law claim for negligence, recklessness, or willful and wanton misconduct has essentially been dismissed by the Court's May 27, 2005 order denying in part the City's motion to dismiss the first amended complaint. *Doc. #16*. In that order, the Court noted that at the May 25, 2005 case management conference, Plaintiff's counsel conceded that state law claims against the City were barred by sovereign immunity. *Id.* Consequently, the Court dismissed the state law claims from Plaintiff's first amended complaint. *Id.* Nevertheless, Plaintiff's subsequent third amended complaint included a state law claim against the City. *Doc. #22*. The Court agrees with the City that the Court has already held that the state law claim is barred by sovereign immunity. Accordingly, the only claims remaining against the City are the two federal claims. Because both claims are essentially *Monell* claims for failure to train and supervise, they will be treated as one claim for purposes of this motion for summary judgment.

In addressing the failure to train and supervise claim against the City, both parties devote much of their briefs to interpreting the contradictory testimony of Defendant Jesus

-6-

Sanchez. For example, in an affidavit sworn to on July 24, 2006,[5] Sanchez states a first-hand knowledge of the improper sexual activity committed by Lorain police officers and opines that the City "turn[ed] a blind eye toward" and did not "meaningfully punish or prohibit police officers in the Department for such misconduct." *Deposition of Jesus Sanchez* (hereinafter "*Sanchez Dep.*"), *Vol. IV,* Ex. A at ¶¶ 3-6. That is, he felt that he "would not be discharged or otherwise disciplined were [he] to engage in sexual contact ... while [he] was on-duty and being paid to be a police officer." *Id*. at ¶9. Yet at his February 2, 2009 deposition, Sanchez testified that he believed that only certain police officers were free to engage in sexual misconduct with impunity, and that he was not one of these select officers. *Sanchez Dep*., *Vol. V*, at 4-5.

Given the dubious and contradictory nature of Sanchez's testimony, and the fact that his credibility is impacted by his agreement with Plaintiff that limits his liability, a jury could not reasonably find for Plaintiff based solely on Sanchez's testimony. Though the Court must draw all inferences in the light most favorable to the nonmoving party, at best Sanchez's testimony represents a scintilla of evidence in support of Plaintiff's position rather than evidence sufficient to defeat summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252. Accordingly, Plaintiff's showing of a genuine issue for trial must rest on evidence beyond Sanchez's testimony.

Plaintiff has met her burden, however, through the deposition testimony of Lorain Police Chief Celestino Rivera. Conducted over three days, the testimony and exhibits introduced

---

[5]The affidavit appears to have been provided by Sanchez to obtain a release and dismissal of Plaintiff's claims in exchange for providing information against the City. *See Rivera Dep.*, *Vol. III., Ex. 41* at 1. Though Sanchez has not been dismissed from the case, Plaintiff has represented to the Court that she has an agreement in place to limit the liability of Sanchez in the event of judgment being entered against him and that the affidavit is part of that agreement.

-7-

at Chief Rivera's deposition create genuine issues of material fact by systematically exploring the long history of sexual misconduct allegedly occurring in the City of Lorain Police Department during Rivera's and Sanchez's tenure.  Because Plaintiff must show that the City's deliberate indifference was closely related to or caused her injuries, only those incidents occurring prior to Officer Sanchez's alleged misconduct are relevant.  Plaintiff has testified that Sanchez's alleged misconduct commenced almost immediately after they met in November 2000 and continued into 2002.  Thus, the relevant incidents are those occurring prior to 2002.

A review of the testimony and exhibits from Chief Rivera's deposition reveals at least ten incidents from which a jury could infer the City's deliberate indifference:

- In June 1987, a complaint was filed against Officer Pittak for harassing a woman with whom he had previously had a relationship, including following her car around and using foul language at her.  Officer Pittak was not disciplined.  *Rivera Dep., Vol. I*, at 46-50.

- Also in June 1987, Officer Albert Rivera handcuffed his wife to a bed and made physical threats against her that involved his service revolver.  Chief Rivera, who was a sergeant at the time, did not recall Albert Rivera receiving any discipline. *Id*. at 93-95.

- In April 1995, just after Chief Rivera had been promoted, Sergeant Puza was accused of exposing himself and asking for oral sex in a woman's restroom.  The victim also alleged that Puza forcibly kissed her and that she went to a rape crisis center for counseling afterward.  The only disciplinary action taken against Sergeant Puza was a letter of reprimand for entering a woman's restroom.  *Id*. at 30-41.

- In June 1995, Dispatcher Darlene Dowell only received a written reprimand when she physically assaulted a man that she was involved with and verbally assaulted that man's girlfriend.  During the incident, despite receiving a call, no officers were dispatched, seemingly in an attempt to protect Dowell.  *Rivera Dep., Vol. II*, at 6-10.

- In December 1998, Officer Pittak was accused of stalking and threatening to kill a woman.  Pittak also tape recorded conversations with the woman and threatened to send them to the woman's boyfriend.  Pittak was not punished nor was the June

       1987 complaint against him considered prior to his disciplinary hearing. *Rivera Dep., Vol. I*, at 59-66.

- In January 2000, Officer Gerek, who was assigned to the Lorain City Court, forcibly kissed a court employee. Despite the objection of the judges of the court, who believed Gerek should be terminated, Gerek was re-assigned to the patrol unit. No criminal charges were filed against Gerek. *Id.* at 50-53.

- In July 2000, Officer Novosielski physically threatened a man he believed was involved with his ex-girlfriend. Novosielski's only punishment was a one day suspension without pay. *Rivera Dep., Vol. II,* at 14-17.

- In November 2000, Patrolman Soto was accused of stalking a married woman, for which he received no discipline. *Rivera Dep., Vol. I*, at 28-30.

- In May 2001, Sergeant Tokarczyk circulated a pornographic picture with a dispatcher's face superimposed on another body. Tokarczyk received a 5 day suspension and was re-assigned to a position located directly across from the complainant. *Rivera Dep., Vol. II*, at 17-26.

- In June 2001, Detective Poli was accused of going over to the house of a woman he had arrested two months earlier and forcing sexual contact on her. A lawsuit was brought and ultimately settled. Detective Poli received no discipline from the police department nor did the department conduct an investigation. Rather, Chief Rivera "took [Detective Poli] at his word" that the accusations were false and did not investigate the matter. *Rivera Dep., Vol. I*, at 16-21.

       These ten incidents do not even include perhaps the most egregious misconduct occurring within the department, committed by Officer Stanley Marrero. Chief Rivera did not dispute that eleven different women filed complaints against Marrero. *Id.* at 54-56. Most shockingly was a complaint filed on May 5, 2000, by a woman named Kelly Moran. According to Moran's complaint Marrero was sent to her house when she and her husband were involved in a domestic dispute. *Id.* at 70-74; *Id.* at Ex. 7. Upon arriving at the scene, Marrero ordered the husband to leave the house, presumably to quell the situation. *Id.* Soon after the husband left, Marrero proceeded to have sexual intercourse with Moran. *Id.* After an investigation, the

complaint against Marrero was sustained.[6] *Id*. However, Marrero's punishment[7] for "a very serious offense" that Rivera found to be "very disgusting" was merely a three day suspension. *Id*.

Additionally, Rivera or others within the department may have been aware of an allegation of a rape committed by Marrero in 1993. *Rivera Dep., Vol. II*, at 98-99. The allegation is currently the subject of a criminal investigation and therefore the parties are limited in their ability to discover relevant information for purposes of the instant matter. However, Rivera acknowledged that in October 2007 he received an email from the victim of the alleged rape, attaching newspaper articles involving misconduct by Lorain police officers, which "said that something very similar happened to her and that she wished somebody had listened to her, or something to that effect." *Id*. From Rivera's summary of the email, a jury could imply that the victim had reported the rape to the police but that no action was taken

**IV.**

Applying the facts to the law, based on Chief Rivera's testimony a reasonable jury could infer that Lorain police officers received inadequate training and/or supervision. The

---

[6]On August 21, 2008, Marrero was indicted in the Lorain County Court of Common Pleas for: two counts of rape; two counts of sexual battery; one count of menacing by stalking; and two counts of gross sexual imposition. *Ohio v. Marrero*, Case No. 08cr76714, Lorain County Court of Common Pleas. Though these indictments eventually received their own case number, they were originally considered supplemental indictments to Case No. 07cr74486, *Ohio v. Marrero*, in the Lorain County Court of Common Pleas where Marrero was indicted for: one count of intimidation of an attorney, victim or witness in a criminal case; two counts of theft in office, restitution, withholding of retirement benefits; one count of menacing by stalking; one count of dereliction of duty; and two counts of public indecency. These cases are still pending.

[7]Because Rivera was out of town at the time of the complaint, the acting chief was responsible for determining Morrero's punishment. Rivera believed that "[l]egally there was no way to change [the punishment]" once it had been handed down. *Id*. at 76.

-10-

record demonstrates that over the course of Sanchez and Rivera's time with the department prior to Plaintiff filing her complaint, at least eleven different officers (including Sanchez and Marrero) allegedly committed misconduct of a sexual nature, including harassment. This represents almost 10% of a police force that at any time consists of approximately 113 people.[8] A jury could rationally determine that the high incidence of misconduct arises from the City's failure to properly train or supervise its officers.

A jury could also reasonably infer that the inadequate training and supervision of the officers resulted from deliberate indifference on the part of the City. There is evidence that none of the incidents detailed above resulted in the termination of a police officer or in any meaningful disciplinary action. After allegedly entering a woman's restroom, exposing himself, and asking for oral sex, the only disciplinary action taken against Sergeant Puza's was a written reprimand for entering the restroom. *Rivera Dep., Vol. I*, at 30-41. Officer Gerek was merely re-assigned after forcibly kissing a court employee. *Id*. at 50-53. Officer Novosielski received a one day suspension for physically threatening a man possibly having a relationship with his ex-girlfriend. *Rivera Dep., Vol. II*, at 14-17. Sergeant Tokarczyk was only suspended for five days after distributing a pornographic picture featuring a dispatcher's superimposed head, and amazingly was re-assigned to a position in the vicinity of the dispatcher. *Id.* at 17-26. And perhaps most disturbingly, Officer Marrero was only suspended for three days after arriving on the scene of a domestic dispute, instructing the husband to leave, and then having sexual intercourse with the wife. *Rivera Dep., Vol. I*, at 70-74. In other incidents, officers received no disciplinary action as there was an attempt to protect them, such as in the case of Dispatcher

---

[8]Rivera estimated this as the number of people he supervises. *Rivera Dep., Vol. I*, at 60.

Dowell, *Rivera Dep., Vol. II*, at 6-10, or they were taken at their word without investigation, as in the case of Detective Poli. *Rivera Dep., Vol. I*, at 16-21. Given the seeming toothlessness of the disciplinary action taken in those infrequent instances where punishment was actually handed down, and the seeming lack of sufficient investigation, a jury could determine that the City was deliberately indifferent to the sexual misconduct occurring within its ranks.

Finally, a jury could determine that the City's deliberate indifference was a cause of or closely related to the injury Plaintiff suffered due to Sanchez's sexual misconduct. With so many incidents taking place that resulted in no punishment or no other meaningful disciplinary action, a jury could reasonably find that Sanchez believed he could commit sexual misconduct without incurring any significant discipline. That is, while Sanchez is obviously responsible for the conduct, a jury could find that Sanchez believed he could commit misconduct with relative impunity because the City's failure to meaningfully discipline other officers committing sexual misconduct amounted to acquiescence of that misconduct. Accordingly, there are genuine issues of material fact as to whether the City was deliberately indifferent to sexual misconduct committed by its police officers and whether that deliberate indifference caused or was closely

(*Continued on next page*)

related to Sanchez's misconduct toward Plaintiff.[9]  The City's Motion for Summary Judgment is therefore denied.

## IV.

For the reasons discussed *supra*, Defendant's Motion for Summary Judgment (*Doc. #73*) is **DENIED**.

**IT IS SO ORDERED.**

                                           */s/ Dan Aaron Polster       Dec. 16, 2009*
                                           **Dan Aaron Polster**
                                           **United States District Judge**

---

[9] The parties submitted supplemental briefing on the testimony of Sergeant Dennis Davis, whose affidavit in support of Plaintiff's opposition brief stated that "he became aware of a number of instances of non-consensual sexual misconduct committed on-duty by Lorain police officers" and that he believed the lack of meaningful discipline received by these officers "led other Lorain police officers to engage in this misconduct which they would not have [otherwise] engaged in." *Doc. #80-2* at ¶¶ 3-5.  However, Sergeant Davis' deposition testimony makes clear that he had no personal knowledge of any sexual misconduct and that his beliefs were based on "chitchat" he heard. *Deposition of Dennis Davis*, at 27, 47.  Accordingly, the City renewed its motion to exclude Davis' affidavit (***Doc. #110)***.  Because "evidence submitted in opposition to a motion for summary judgment must be admissible" and Davis' knowledge is "based solely upon information that he received elsewhere" it is inadmissible hearsay. *Alpert v. U.S.*, 481 F.3d 404, 409 (6th Cir. 2007).  Therefore the Court will not consider Davis' affidavit and the City's renewed motion is **DENIED AS MOOT**.  Nevertheless, the testimony of Chief Rivera is sufficient to create a genuine issue of material fact as to Plaintiff's *Monell* claim against the City.